## AFFIDAVIT OF FRANCIS J. CONWAY
## IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Francis J. Conway, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.　　I am a Special Agent with the Internal Revenue Service, Criminal Investigation Division ("IRS-CI"), and have been so employed since July 2000.  My responsibilities as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Laws (26 U.S.C. §7201 et seq.), the Bank Secrecy Act (31 U.S.C. §5324 et seq.), and the Money Laundering Control Act (18 U.S.C. §§1956, 1957, and 1960), and the forfeiture of assets based on these and related offenses (18 U.S.C. §981 et seq. and 31 U.S.C. §5317).  I attended twenty-six weeks of specialized training at the Federal Law Enforcement Training Center in Glynco, Georgia that focused on the criminal violations investigated by IRS-CI Special Agents and included training on criminal statutes, constitutional law, investigative tools and techniques, interviewing, and debriefing of witnesses.  I have also attended yearly continuing professional education training from IRS-CI and other agencies, including training provided by the Department of Justice Asset Forfeiture and Money Laundering Section, dealing with tax and money laundering investigations, violations of the Bank Secrecy Act and other federal criminal statutes, and related civil and criminal forfeiture law, practice, and procedure.

2.　　I have been assigned to the Boston OCDETF Strike Force, Drug Enforcement Administration (DEA) Group 3, since March 2007.  I have participated in the investigation and prosecution of criminal organizations involved in the distribution of controlled substances and related money laundering violations, both international and domestic.  I have requested and participated in the preparation and execution of several seizure warrants resulting in the seizure of assets derived from narcotics trafficking and other illegal activities including structuring

monetary transactions to evade currency reporting requirements.  Since becoming a Special

Agent with IRS-CI, I have conducted or participated in numerous investigations of unlawful

distribution of controlled substances in violation of Sections 841(a)(1), 843(b), 846, 952, 960 and

963 of Title 21, United States Code, and the laundering of monetary instruments in violation of

Title 18, United States Code, Sections 1956 and 1957.  I have served as the affiant for warrants

and have participated in Title III investigations. These investigations have involved the use of

confidential sources ("CS"), cooperating witnesses ("CW"), undercover agents ("UC"),

consensual monitoring, electronic and physical surveillance, telephone toll analysis, pole

cameras, Global positioning system ("GPS") tracking, interviews, electronic interceptions, and

other investigative techniques.  I have also participated personally in physical surveillance,

surveillance of undercover transactions, the introduction of undercover agents, the execution of

search warrants, and debriefings of defendants, informants and witnesses, and the review of

taped conversations and telephone, financial, and drug records.  I have also discussed these

subjects frequently with other experienced law enforcement officers.  I have participated in

investigations involving the transportation of controlled substances or proceeds/payments

through the United States Postal Service ("USPS"), which have included the interception of

Express Mail and/or Priority Mail packages that contained controlled substances or the proceeds

from the sales of controlled substances.  Through my training and experience, I have become

familiar with the manner in which illegal drugs are imported, transported, stored, and distributed,

and the methods of payment for such drugs.

      3.     Through my training and experience, I have become familiar with the manner in

which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they

collect and launder drug proceeds. I am familiar with the manners and methods by which

narcotics trafficker's package and prepare narcotics for transportation and distribution, their methods of operation, and security measures which are often employed by narcotics traffickers to avoid vulnerability to law enforcement and to other drug dealers who might attempt to steal their narcotics, their profits, and/or their customers. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

4.      Based on my training and experience, I am also familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use personal, borrowed, and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions. I am aware that drug traffickers often transport drugs and drug proceeds in motor vehicles, and that drug traffickers often use their vehicles to meet with other co-conspirators, including their sources of supply and/or their drug customers, and to travel to and from the residences of co-conspirators and storage sites for drugs and drug proceeds. Drug traffickers also use their vehicles to go to banks and other financial institutions to deposit drug proceeds and/or transfer funds to purchase drugs. Experienced drug traffickers will often engage in counter-surveillance maneuvers while driving an automobile in an attempt both

to determine whether they are being followed by law enforcement and to evade any law enforcement officers who may be conducting surveillance. I am also aware, from my training and experience, that drug traffickers often install and use electronically operated hidden compartments in motor vehicles to conceal large quantities of drugs and drug proceeds.

5.      More broadly, based upon my training and experience, I know that tracking drug traffickers (in motor vehicles and otherwise) frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

6.      The conclusions and opinions set forth below are based on my experience and training, my participation in this investigation, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation.  Throughout this Affidavit, statements that "I know" and "I believe" certain facts are based upon this combination.

## REQUEST FOR ISSUANCE OF WARRANTS

7.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the mobile phone assigned 978-996-3292 (the "Target Mobile Phone"), the subscriber to which is Sareth Yut, 58 Midland Street, Lowell, MA 01851, and that is believed to belong to SARATH YUT.  The service provider for this phone is T-Mobile USA, Inc., ("T-Mobile") a

wireless telephone service provider that accepts service of process at 4 Sylvan Road, Parsippany, New Jersey.  The Target Mobile Phone is further described in Attachment A, and the location information to be seized is further described in Attachment B.

8.      I also make this affidavit in support of an application for an Order, pursuant to Federal Rule of Criminal Procedure 41(e)(2)(C) and Title 18, United States Code, Section 3117, authorizing agents of the Federal Bureau of Investigation (FBI), IRS-Criminal Investigation(IRS-CI), the United States Postal Inspection Service (USPIS) and the Lowell Police Department surreptitiously to monitor, repair, replace, and use a real-time Global Positioning System ("GPS") mobile tracking device for 45 days on the following motor vehicle located in the District of Massachusetts (hereinafter, the "TARGET VEHICLE") for the purpose of monitoring and recording data regarding the movement of this motor vehicle both inside and outside the District of Massachusetts:

A blue 2005 Dodge Ram pickup truck, bearing Massachusetts registration 2DL396, vehicle identification number (VIN) 1D7HU18N25S247048, registered to Sreymom SUONG, 71 Corbett Street, Lowell, Massachusetts.

9.      Based on the facts set forth in this affidavit, there is probable cause to believe that SARATH YUT and others have violated 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute and to distribute controlled substances) and 18 U.S.C. § 1956(h) (money laundering conspiracy) (hereinafter, the "Target Offenses").  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these crimes and will lead to the identification and location of those who committed them

10.      Based on the investigation to date, I believe that the TARGET VEHICLE is being used by YUT to acquire narcotics from sources of supply and proceeds of narcotics sales and to

transport narcotics and proceeds of narcotics sales.  As further described below, there is probable cause to believe that: (a) YUT has committed, is committing, and will continue to commit one or more of the TARGET OFFENSES; (b) the TARGET VEHICLE is being used and will continue to be used to facilitate the commission of the TARGET OFFENSES; and (c) the data obtained from the GPS device about the geographic location of the TARGET VEHICLE will constitute and/or will lead to evidence, fruits, and instrumentalities of the TARGET OFFENSES as well as to the identification of the individuals who are committing those and related crimes.  There is also probable cause to believe that the TARGET VEHICLE is an instrumentality of the TARGET OFFENSES in that it is being used in committing one or more of the TARGET OFFENSES.

11.     I submit this affidavit for the limited purpose of establishing probable cause for the requested warrants.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation; facts not presented herein are not relied on as the basis for this request.

## BACKGROUND OF INVESTIGATION

12.     On September 11, 2019, the Court issued a search warrant for location information for the Target Mobile Phone.  Case No. 19-MJ-1264-DLC.  I hereby incorporate and specifically attach the affidavit submitted in support of that application (hereinafter, "Zaremba September 11, 2019 Affidavit").

13.     On October 4, 2019, the Court issued a "sneak and peek" search warrant for a USPS Priority Mail Express package, bearing tracking number EJ120562507US (hereinafter the "SUBJECT PACKAGE").  Case No. 19-MJ-6437-MPK.  I hereby incorporate and specifically attach the affidavit submitted in support of that application (hereinafter, "Sackett October 4, 2019 Affidavit").

14.     On October 10, 2019, the Court issued search warrants for location information for the Target Mobile Phone and for the installation and use of a GPS mobile tracking device for the TARGET VEHICLE.  Case No. 19-MJ-1269-DLC and 1270-DLC.  I hereby incorporate and specifically attach the affidavit submitted in support of those applications (hereinafter, "Zaremba October 10, 2019 Affidavit").

15.     The TARGET VEHICLE is registered to Sreymom Suong, a known associate of YUT.  Sreymom SUONG has been identified as the sister of Barndol SUONG, who is a CMF/OFC member and is a close associate of YUT.  *See* Zaremba September 11, 2019 Affidavit at fn. 10.  Nevertheless, I know that SARATH YUT is the actual user of the TARGET VEHICLE for several reasons.  As early as October 13, 2018 Lowell Police Department has field interviews of YUT identifying him driving the TARGET VEHICLE.  Since December 22, 2018, YUT has been observed consistently operating the TARGET VEHICLE by FBI surveillance.[1] The TARGET VEHICLE has also been observed late at night parked at locations where YUT is known to reside.[2]  Additionally, multiple Sources of Information (SOI) have provided intelligence stating that YUT drives a blue Dodge pickup truck.  Furthermore, surveillance has observed YUT, while driving the TARGET VEHICLE engage in counter-surveillance, such as constantly looking in his mirrors, driving in and out of several parking lots and other behaviors

---

[1] For example, on December 22, 2018 at 1:05 p.m. surveillance observed YUT depart 685 Lawrence Street and drive the TARGET VEHICLE.  On February 28, 2019, Lowell Police stopped YUT while driving the TARGET VEHICLE.

[2] For example, on June 27, 2019 at 2:40 p.m., the TARGET VEHICLE was parked at 17 Walker Street, Lowell, MA.  On July 2, 2019 at 4:12 p.m., the TARGET VEHICLE was again parked at 17 Walker Street.  On July 24, 2019, at 10:33 p.m., surveillance observed the TARGET VEHICLE arrive at 17 Walker Street and then depart seven minutes later.  Since September 13, 2019, locational data for the Target Mobile Phone has consistently placed the Target Mobile Phone at 17 Walker Street during the night and early morning hours.  Accordingly, I believe YUT currently resides at 17 Walker Street.

consistent with someone attempting to identify surveillance.  As a result, law enforcement has discontinued surveillance for fear of detection.

16.     During the course of this investigation, agents identified 105 Tanner Street, Lowell, Massachusetts, which is a single story storage unit, as a possible stash location utilized by YUT to store, process and distribute controlled substances.  Investigators have observed YUT with the TARGET VEHICLE and several of his associates regularly gather at the location, often times carrying what appear to be white boxes with red and blue striping (U.S. Priority Mail and/or U.S. Priority Mail Express).  Accordingly, investigators installed a pole camera to observe this location.

## PROBABLE CAUSE

17.     I am aware that YUT has conducted counter-surveillance while driving the TARGET VEHICLE.  For example, on May 8, 2019, at 1:00 p.m., law enforcement initiated surveillance at 685 Lawrence Street, Lowell, MA, and observed the following.  At 1:34 p.m., YUT entered the TARGET VEHICLE and two minutes later departed.  On the drive, YUT pulled into and out of multiple parking lots and stopped on a street for no apparent reason, while constantly looking in the mirrors of the TARGET VEHICLE.  YUT drove to North Andover High School, where he picked up an unknown male at 2:02 p.m., and immediately departed. Surveillance followed YUT for another three minutes and then discontinued based on YUT's erratic driving, which they believed was counter-surveillance.

18.     On May 9, 2019, an FBI cooperating witness (hereinafter, CW-3)[3] made a controlled purchase of approximately 62 grams of Cocaine from SAMBO BUTH, a known CMF

---

[3] Between May 2019 and July 2019, CW-3 made four consensually monitored controlled purchases of illegal narcotics, including cocaine, fentanyl and heroin, and one consensually monitored purchase of illegal narcotics and a firearm from SAMBO BUTH.  CW-3 is facing state charges and is cooperating in the anticipation of a recommendation for more lenient treatment.  CW-3 has also been paid by the FBI for providing assistance.  CW-3

member.[4]  Surveillance was established on 35 Dana Street, Lowell, MA, and observed the

following.  At 5:43 p.m., BUTH arrived at 35 Dana Street in a black Acura RDX, MA

registration 8NB586 (the "black Acura") and entered the garage of 35 Dana Street; at 5:48 p.m.,

he departed the garage, reentered the black Acura RDX and drove away from Dana Street.  For

the next 49 minutes, BUTH made four stops at different residences, each for approximately 5

minutes or less.  At 6:37 p.m. BUTH arrived at 105 Tanner Street (initially identified by

surveillance as 113 Tanner St, but subsequent investigation determined these events in fact

occurred at 105 Tanner St.) and parked behind the TARGET VEHICLE.  As BUTH arrived, the

door to 105 Tanner Street opened and an adult male whom surveillance could not identify stood

in the doorway.  Both BUTH and the unidentified male entered 105 Tanner Street.  At 6:44 p.m.,

BUTH exited 105 Tanner Street and departed.  The TARGET VEHICLE remained at 105

Tanner Street.  BUTH drove directly back to 35 Dana Street, arriving at 7:10 p.m.  At 7:24 p.m.,

CW-3 arrived and was met by BUTH and then they both went into the garage.  At 7:32 p.m.,

CW-3 exited the garage and returned to the predetermined meeting location, where CW-3 turned

over the drugs.  Shortly after CW-3's departure, BUTH again departed 35 Dana Street.  Based on

the continued surveillance of BUTH and the continuous activity at 105 Tanner Street, I believe

---

has criminal convictions including illegal firearms possession, home invasions, and witness intimidation.  CW-3 has
provided information and assistance which has led to search and arrest warrants and I am not aware of CW-3
providing information that was found to be unreliable.  I believe that the information provided by CW-3 in this
investigation is accurate because of CW-3's record for reliability and because of the use of consensual recordings for
corroboration.

[4] Prior to the controlled buy, agents searched CW-3 for money or contraband, with negative results, equipped CW-3
with recording and transmitting equipment, and instructed CW-3 to make a purchase of drugs from BUTH.  Agents
kept CW-3 under surveillance during the transaction, during which CW-3 met with BUTH.  Following the
transaction, CW-3 met agents at a predetermined location, where they again took custody of the drugs, retrieved the
recording and transmitting equipment, and again searched CW-3 with negative results.

the drugs came from 105 Tanner Street, and that the unidentified male who met BUTH at 105 Tanner Street was YUT (who likely drove there in the TARGET VEHICLE).

19.     On August 29, 2019, starting at approximately 5:00 p.m., via a pole camera and physical surveillance, law enforcement observed the following: YUT arrived at 105 Tanner Street driving the TARGET VEHICLE; at 5:15 p.m., YUT entered the storage unit at 105 Tanner Street holding a couple of white boxes, then exited, walked back to the TARGET VEHICLE, and entered the unit holding another white box and tube container.  At 5:57 p.m. YUT departed the storage unit holding the tube container, appeared to use his phone, and left the area in the TARGET VEHICLE.  At 7:54 p.m., YUT returned to 105 Tanner Street in the TARGET VEHICLE.   At 8:10 p.m. a white Kia Optima, bearing MA registration 8LJ178 (the "white Kia"), arrived at 105 Tanner Street.  Shortly thereafter, YUT used a key to enter 105 Tanner Street, carrying what appeared to be a large plastic black bag in his left hand followed by a male identifiable as Eric FURTADO.  At 8:29 p.m., YUT and FURTADO exited 105 Tanner Street, with FURTADO holding a different small black bag.  FURTADO then departed in the white Kia and YUT returned to the TARGET VEHICLE.  I believe that YUT likely distributed drugs to FURTADO.

20.     On the same day (August 29, 2019), at approximately 8:51 pm, via a pole camera, surveillance observed the following: YUT, still parked in the TARGET VEHICLE at 105 Tanner St, Lowell, MA, flashed the headlights a few times and a white Honda CRV, bearing the license plate Massachusetts 297VC1 (the "white CRV") arrived and parked behind the TARGET VEHICLE.  YUT got out of the TARGET VEHICLE and, with the driver of the white CRV, entered 105 Tanner Street.  The male driver of white CRV wore dark colored pants, a t-shirt, a light colored baseball cap, and black and white shoes.   At approximately 8:55 pm, YUT and the

other male driver left 105 Tanner Street, with the male driver carrying a white trash bag.  At

approximately 8:56 pm, the white CRV departed and took a right onto Tanner Street towards

Lincoln Street.  Mobile surveillance continued to observe the white CRV turn right onto Lincoln

Street towards Chelmsford Street and then cross Chelmsford Street onto Liberty Street towards

Powell Street.

   21.  Following those observations, members of the Lowell Police Department

observed the white CRV fail to stop for a marked stop sign on Liberty Street by Powell Street

and pulled the white CRV over.  The driver identified himself as GERSON MANZUETA, the

registered owner of the white CRV.  Officers asked MANZUETA if he had any drugs and he

answered "just weed."  Officers observed a medium sized, white trash bag – the same bag

observed earlier – with what appeared to be a large amount of marijuana.  Upon further

investigation, officers found that the white trash bag contained two packages of marijuana, both

weighing approximately one pound.  Officers also saw a black computer bag on the rear seat of

the white CRV, which contained another approximately one pound bag of marijuana.  Officers

searched the car and recovered other evidence of drug distribution, specifically a white

prescription bottle of polyethylem glycol, a suspected cutting agent, and a motorized grinder,

used to prepare narcotics.  MANZUETA was issued a citation for failure to stop and arrested for

possession of a class D substance with intent to distribute.  I believe, based on the continuous

observation of the white trash bag, that the marijuana came from YUT.

   22.  As described in the Sackett October 4, 2019, Affidavit, I am aware that YUT

frequently sent packages to locations in California which were consistent with drug dealing and

money laundering.  For example, on October 4, 2019, at approximately 3:52 p.m., by pole

camera surveillance, agents observed YUT and a conspirator enter 105 Tanner Street, which has

been previously identified as a stash location.  At approximately 4:02 p.m., the conspirator left

the building, went to his car, and returned to the location carrying mailing envelopes.  Starting at

approximately 4:06 p.m., the conspirator left carrying a package and then YUT separately left

carrying a package and drove in the TARGET VEHICLE.  At approximately, 4:33 p.m., YUT

arrived at the Lowell Post Office.  This pattern was consistent with the other mailings described

in the Sackett October 4, 2019 Affidavit.

23.     Inside the post office, YUT mailed the SUBJECT PACKAGE, which was then

intercepted by the United State Postal Inspection Service.  As authorized by the search warrant,

agents opened the SUBJECT PACKAGE and found that it contained several layers of additional

packaging, including a soft Priority Mail Express envelop, a hard Priority Mail Express envelop,

and vacuum and heat sealed contents.  The vacuum and heat sealed contents were additionally

wrapped in a brown paper bag, further concealing the contents.  Upon manipulation of the sealed

contents, investigators saw that they appeared to contain three individual stacks of unknown

items, similar in consistency to stacks of money.  I believe the SUBJECT PACKAGE, and the

other packages sent by YUT, contained the proceeds of illegal drug sales, which YUT attempted

to conceal because of their illegal nature.[5]  Additionally, YUT sent money to multiple locations

in California, which causes me to believe that YUT has multiple sources of supply for illegal

drugs.

24.     On October 14, 2019, at approximately 11:37 pm, law enforcement via pole

camera observed YUT and Sochitta SAL exiting 105 Tanner Street, with YUT carrying a large

black plastic trash bag, which he placed in the TARGET VEHICLE.  YUT and SAL both entered

the TARGET VEHICLE.  At approximately 11:40 pm, the TARGET VEHICLE departed 105

---

[5] Incidentally, YUT specifically described this method in prior phone calls to MAO.

Tanner Street and, according to electronic surveillance, at approximately 11:45 pm arrived at 685

Lawrence Street, Lowell, MA, which is an historical address for YUT.

25.     On October 15, 2019, at approximately 4:30 pm, agents executed a trash pull on

the dumpsters located at 685 Lawrence Street and recovered the large black plastic trash bag.

Law enforcement found in the bag United States Postal Service priority mail packaging the name

"Jason Chan," which is the alias that YUT regularly uses when sending packages to the West

Coast (as described in the Sackett October 4, 2019 Affidavit).  The following additional items of

interest were found:

a)     Brown and clear packaging with residue which tested positive for cocaine using
TruNarc system;
b)     Ziplok bag with residue which tested positive for MDMA using TruNarc system;
c)     Ziplok bag with residue which tested positive for fentanyl or methamphetamine
compound using TruNarc system;
d)     18 plastic bags with suspected cocaine residue;
e)     Personal protective equipment with drug residue;
f)     Heat sealed packaging;
g)     Heat sealed packaging with labeling;
h)     Marijuana;
i)     Premium Cannabis Runts;
j)     Mohegan Sun Card in the name of Vongnaroth S. Proeung;
k)     myvitaminpress.com packaging label;
l)     Black taped drug packaging with suspected cocaine residue;
m)     Brown packaging labeled "China" with suspected cocaine residue;
n)     Plastic packaging with suspected cocaine residue;
o)     Jar seal with suspected cutting agent residue;
p)     Mail packaging;
q)     Shield and seal packaging;
r)     Miscellaneous additional packaging;
s)     Packaging boxes; and
t)     Milk bone box.

I believe that these items are consistent with receiving, preparing, re-packaging and

distributing drugs.  Combined with prior observations of Tanner Street, I believe that YUT is

using that location for his illegal drug business.

26.     Accordingly, I believe that YUT uses the TARGET VEHICLE to facilitate drug distribution and money laundering and that the location of the TARGET VEHICLE will provide evidence of the Target Offenses.  Similarly, I believe that location information for the Target Mobile Telephone will enable investigating agents to locate YUT in possession of the Target Mobile Phone and thereby provide evidence of the Target Offenses.

## AUTHORIZATION REQUEST FOR TARGET MOBILE PHONE

27.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service:  (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise than E-911 Phase II data.

28.     I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.

29.     I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the

information described in Attachment B unobtrusively and with a minimum of interference with
T-Mobile's services, including by initiating a signal to determine the location of the Target
Mobile Phone on T-Mobile's network, and at such intervals and times as directed by the
government.  The government will compensate T-Mobile for reasonable expenses incurred in
furnishing such facilities or assistance.

30.     I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C.
§§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the
subscribers or customers to whom the materials relate) of the existence of this application, the
warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's
Order or upon notice by the government within 30 days of the conclusion of its investigation,
unless the Court extends such period under 18 U.S.C. § 2705(b)  T-Mobile may disclose this
Order to an attorney for T-Mobile for the purpose of receiving legal advice.  Non-disclosure is
appropriate in this case because the Court's Order relates to an ongoing criminal investigation
that is neither public nor known to all of the targets of the investigation, and its disclosure may
alert the targets to the existence of the investigation.  There is accordingly reason to believe that
notification of the existence of the Order will seriously jeopardize the investigation, including by
giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with
evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or
physical safety of an individual.  See 18 U.S.C. § 2705(b).

31.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal
Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any
required notice until 30 days after the collection authorized by the warrant has been completed.
There is reasonable cause to believe that providing immediate notification of the warrant may

have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the

subscriber or user of the Target Mobile Phone would seriously jeopardize the ongoing

investigation, as such a disclosure would give that person an opportunity to destroy evidence,

change patterns of behavior, notify confederates, and flee from prosecution.  See 18 U.S.C. §

3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the

proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. §

3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or

electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic

information, there is reasonable necessity for the seizure for the reasons set forth above.  See 18

U.S.C. § 3103a(b)(2).

32.     I further request that the Court authorize execution of the warrant at any time of

day or night, owing to the potential need to locate the Target Mobile Phone outside of daytime

hours.

## AUTHORIZATION REQUEST FOR TARGET VEHICLE

33.     It is requested that the Court order surreptitious entry in order to effect the

installation, repair, replacement, and removal of the tracking device on the vehicle at any time of

day or night, because opportunities during daylight hours to place the tracking device without

detection by its owner or others would pose a risk that the overall investigation would be

compromised.

34.     The proposed tracking device will use global position systems ("GPS") tracking

to determine the location of the TARGET VEHICLE and to record the position at regular

intervals in order to create a log of movements that can be viewed in real-time on the Internet

with a web browser.

35.     Based on the investigation described above, I believe that TARGET VEHICLE is
presently located in the District of Massachusetts, particularly at night.  It is requested that the
warrant authorize use of the device to track the movement of the TARGET VEHICLE while the
vehicle is located within the District of Massachusetts and also outside of the District of
Massachusetts.

36.     It is requested that this warrant authorize the use of the tracking device for a time
period not to exceed 45 days from the issuance of this warrant, unless extended by the Court for
good cause, during which time the TARGET VEHICLE can be monitored during daytime and
nighttime hours and includes tracking device signals produced from inside private garages and
other locations not open to the public or visual surveillance, and signals produced in the event
the vehicle leaves the District of Massachusetts but remains within the United States pursuant to
Title 18, United States Code, Section 3117.

37.     Title 18, United States Code, Sections (a)(b) (otherwise known as the "Patriot
Act") amended Title 18, United States Code, Section 3103a(b) to permit searches with delayed
notification. There is reasonable cause to believe that providing immediate notification of the
execution of the warrant may have an adverse result. 18 U.S.C. §3103a(b)(1). Providing notice
of execution of the warrant to YUT would seriously jeopardize the ongoing investigation, as
such a disclosure would give YUT and/or his co-conspirators an opportunity to destroy evidence,
change patterns of behavior, notify confederates, and/or flee or continue flight from prosecution.
Because immediate notification of the execution of the warrant may have an adverse result as
defined at Title 18, United States Code, Section 2705(a)(2), including resulting in flight from
prosecution or destruction of or tampering with evidence, and otherwise seriously jeopardizing
this investigation, I request that notification be delayed for a reasonable period not to exceed 30

days after use of the tracking device has ended, unless further extended by the Court for good cause. This investigation is ongoing, and it is anticipated that many more search warrants and arrest warrants will be executed in the near future, which i believe could be compromised should the person(s) being tracked under this search warrant be notified of the law enforcement investigation.

## CONCLUSION

38.     I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the search warrant for the Target Mobile Phone to T-Mobile and that copies of the Court's Order in full or redacted form may be served on special agents and other investigative and law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the Court's Order. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

39.     Therefore, I request that a search warrant be issued to allow for the use and monitoring of a real time Global Positioning System tracking device on the TARGET VEHICLE and recording the location of the TARGET VEHICLE at regular intervals in order to create a log of movements which can be viewed in real-time on the Internet with a web-browser. I further request that the search warrant authorize FBI, IRS-CI agents, USPIS Inspectors or other authorized persons to enter onto private property to effect any needed repair or replacement; allow for the tracking of the movement of the device in the United States, both within and

outside of the District of Massachusetts, and in both public and private spaces and other private

buildings not otherwise open to the public or open to public view; authorize monitoring for a

period of 45 days from the date of issuance of the warrant, unless extended by the Court for good

cause; order that notification be delayed for a reasonable period not to exceed 30 days after use

of the tracking device has ended, unless further extended by the Court for good cause.

.

Francis J. Conway, Special Agent
IRS-Criminal Investigation

Subscribed and sworn to me this
25th day of November, 2019

DONALD L. CABELL
United States Magistrate Judge
District of Massachusetts



**ATTACHMENT A**

Information about the location of the mobile phone assigned 978-996-3292 (the "Target

Mobile Phone"), whose service provider is T-Mobile USA, Inc.**,** a company that accepts process

at 4 Sylvan Road, Parsippany, New Jersey.

## ATTACHMENT B

All information about the location of the Target Mobile Phone described in Attachment A for a period of thirty days from the date of service of this warrant, during all times of day and night, including:

1. E-911 Phase II data;

2. GPS data;

3. latitude-longitude data;

4. other precise location information; and

5. data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Mobile Phone.

This warrant does not authorize the collection of any content of any communications.

T-Mobile USA, Inc. ("T-Mobile") must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Mobile Phone unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the

Court extends such period under 18 U.S.C. § 2705(b).  *See* 18 U.S.C. § 2705(b).  T-Mobile may

disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.